**PLASTPRO, INC., Plaintiff,**

v.

**THERMA–TRU CORP., Defendant.**

**Civil Action No. 97–1222(JCL).**

United States District Court,
D. New Jersey.

June 13, 2005.

Allyn Zissel Lite, Esq., Lite, Depalma, Greenberge & Rivas, Esqs., Newark, NJ, Richard M. Rosati, Esq., Andrew L. Reibman, Esq., Kenyon & Kenyon, Esqs., New York, NY, for Plaintiff.

Sherilyn Pastor, Esq., McCarter & English, Newark, NJ, Sangeeta G. Shah, Esq., Brooks, Kushman, Esqs., Southfield, MI, for Defendants.

## MEMORANDUM AND ORDER

LIFLAND, District Judge.

Presently before the Court is Plaintiff Plastpro Inc.'s motion seeking a summary declaratory judgment that its accused grained fiberglass door assemblies do not

infringe United States Patent No. 4,550,-540 ("the '540 patent"), which is assigned to Defendant Therma–Tru Corporation. Specifically at issue is whether Plastpro's fiberglass doors satisfy the claim limitation that the outer surface of the door "skins" be "essentially devoid of glass fibers for a predetermined depth of at least 0.005 inch" ("the fiber-free claim limitation"). The parties primarily disagree as to the proper construction of the term "glass fibers." Because the facts in this case are not in dispute, the Court's construction of the disputed language in the claim effectively resolves this patent infringement action.

## Background

### A.  Procedural History

Plastpro filed its complaint on March 17, 1997, seeking a declaration that its door assemblies do not infringe claims 1,2,4,5, and 6 of the '540 patent.  On June 24, 2003, this Court ruled that certain of Plastpro's accused door assemblies do not infringe the '540 patent as it relates to the structural relationship between the door skins and the door frame.  The Court expressly limited its opinion to two primary fiberglass door structures specifically put in issue in the motion, noting that "[a]ny other doors ... sold by Plastpro are not the subject of this motion." (*Plastpro v. Therma–Tru v. Nan Ya Plastics Corp.*, No. 97–1222(JCL), at 4–5).  The instant

motion applies to all of Plastpro's remaining grained fiberglass doors.[1]

### B.  The '540 Patent and Prosecution History

#### i.  The '540 Patent

The '540 patent discloses a "Compression Molded Door Assembly," which consists of compression molded[2] skins (made of a molding resin and reinforcing glass fibers) adhering to a foamed core.  A texture is molded on the exterior of the skins to simulate the grain and texture of a wood door.  As described in the Summary of the Invention, the '540 patent achieves three primary goals: 1) the exterior of the doors closely simulates the texture and grain of wood;  2) the door assembly may be trimmed for insertion in an opening, thus allowing preinstallation adjustments to meet job-specific circumstances;  3) the door assembly resists permanent deflection[3] and warping when exposed to temperature differentials and humidity.  (*Id.*, Exh. A, col. 1, ll. 62–68; col. 2, ll. 1–4.).

As described in the specification, glass fibers are "eliminated" from the surface of the door skins.  (*Id.*, col. 3, ll. 16–18.). The purpose of the fiber-free claim limitation is to embed the glass fibers within the skin to a certain depth so that they are not exposed on the skin's surface.  Surface exposure of the glass fibers causes "wick-

---

1.  As Plastpro notes in its brief, "the reasons why the remaining accused doors lack the fiber-free claim limitation and, therefore, do not infringe the '540 patent also apply to the Plastpro door assemblies found not to infringe in this Court's June 25, 2003 Order since the skins for *all* the grained fiberglass doors sold by Plastpro are made from the same basic formulation and under the same molding conditions."  Pl. Br. at 2 n. 3 (emphasis in original).

Although Plastpro's door manufacturer, Nan Ya Plastics Corporation ("Nan Ya"), initially made several variations on the internal

structure of the doors, the physical properties of the doors have remained constant. (McQuillen Dec., Exh. L, Dep. of Charles L. Tucker, at 14 ll. 6–21.).

2.  "Compression molding" refers to the process by which molding compounds are heated, pressed, and formed into "high-quality appearance parts."  (McQuillen Dec., Exh. B, SHEET MOLDING COMPOUND MANUAL, at 5, 34).

3.  "Deflection" refers to the movement of a structure or structural part due to stress.

ing"[4] of finishing stains and diffuses the reinforcing properties of the fibers throughout the skin rather than concentrating them toward the center of the skin. The concentration of the glass fibers near the centroid of the skin reduces deflection in the door structure. (*Id.*, ll. 16–25.).

### ii. Prosecution History

The '540 patent derives from U.S. Patent Application 16/456,400 ("the '400 application") filed on January 7, 1983. (McQuillen Dec., Exh. C, at 3; Exh. A, col. 1, ll. 5–6.). The eight claims in the '400 application did not indicate that the outer surface of the door skin was "essentially devoid of glass fibers for a predetermined depth of at least 0.005 inch." (*Id.*, Ex. C, at 9–10.). None of the claims in the '400 application said anything about glass fibers in the door skins, noting only that the "outer side of each skin defin[es] a molded textured pattern simulating the grain and texture of a wood door." (*Id.* at 9.). However, the specification recites that "a compression molded sheet molding compound (SMC) panel ... includes 15% to 40% fibrous glass reinforcement." (*Id.* at 6.).

In response to the Patent Office's October 5, 1983 rejection of the '400 application, Therma–Tru requested an amendment to the specification and claims. (*Id.* at 39.). The sole independent claim was amended to include a depth specification for the molded textured pattern on the outer surface of the door skin: "said textured pattern ha[s] a depth between .003 inches and .009 inches." (*Id.*). Therma–Tru distinguished three prior art references on the basis that the '400 application required *compression molding* (as distinct from a "cold press lay-up technique," a "cold cast technique," and a "low pressure casting method.") (*Id.* at 41–42.). It was asserted that *compression molded* skins

allowed surface graining of a depth between .003 and .009 inches, a grain pattern feature "in which the relatively small depth of openings allows a wiping stain having pigments of defined mesh sizes to be placed into such openings." (*Id.* at 41.). The specification correlates grain depth and grain openings for effective staining, but it says nothing about the role of glass fibers in the process. (*Id.*). After the Patent Office rejected all the claims in the amended '400 application, Therma–Tru abandoned the application. (*Id.* at 48.).

Therma–Tru then filed continuation-in-part application 594,549 ("the '549 CIP application") on March 29, 1984. (*Id.*, Exh. D, at 4–11.). The sole independent claim 1 of the '549 CIP application included limitations that "said compression molded skins being integral, including a molding resin and glass fibers, said outer side of said skin being essentially devoid of glass fibers for a predetermined depth of at least 0.005 inch ... but not in excess of such predetermined depth." (*Id.* at 10.). The Patent Office rejected the ten asserted claims based on prior art. (*Id.* at 20–23.).

Therma–Tru filed an Amendment with the Patent Office in which it added two claims and requested reconsideration of the decision. (*Id.* at 44.). At that time Therma–Tru argued that "[t]he combination of opposed [sheet molding compound] panels bonded on a perimeter frame with adhering foam, where the exterior surface is *devoid* of glass fibers and the grain depth is between .003 and .009 inch results in a door assembly which is far superior to prior art doors." (*Id.* at 47.)(emphasis added).

The Patent Office responded that it would allow claims 7–10 (dealing with the structural relationship between the skins

---

4. "Wicking" describes the carrying away of    liquid or moisture by capillary action.

and the frame around the door unit) if "rewritten in independent form including all of the limitations of the base claim and any intervening claims." (*Id.* at 63–64.). Consequently, all of the independent claims of the '540 patent—claims 1, 10, 11, 12, and 13—contain the fiber-free claim limitation.

The Patent Office conducted a re-examination of the '540 patent in 1999. (*Id.*, Exh. E.). At that time the patentability of claims 1–13 was confirmed. (*Id.*, Exh. F, at 3.). In a July 25, 2002 Office Action, the Patent Office again confirmed the patentability of claims 7, 9, 11, and 12, but rejected claims 1–6, 8, 10, and 13. (*Id.*). Therma–Tru requested reconsideration of all claims on September 25, 2002. (*Id.*, Exh. F.).

In its request for reconsideration, Therma–Tru specifically distinguished its invention from the relevant prior art. (*Id.* at 5–6.). The Examiner had proposed that it would have been obvious to one of ordinary skill at the time of the invention "to make the outside surfaces of the skins of [the cited reference] essentially devoid of glass fibers to provide a low surface porosity and to make the casing highly resistant to chemical attack and high humidity as taught by [another cited reference]." (*Id.* at 5.). Therma–Tru acknowledged that one of the references had recognized "the problem of glass at the outer surface of the door skins," but that Therma–Tru's solution to this problem was a distinguishing feature:

> None of the cited references disclose or suggest compression molding the ... skins with a fine wood grain texture having a depth of .003–.009 inches to suppress the glass fibers to the claimed .005 inch depth. None of the cited references show this feature, let alone in combination with the other features recited in the claims. Indeed ... the cited

references teach away from this solution, since each teaches applying a gel coat to the outer surface of the [ ] skins as a protective layer.

(*Id.* at 6.).

Thus, Therma–Tru clearly viewed the fiber-free claim limitation as vital to its invention.

C. *Material Facts*

All of the doors sold by Plastpro have certain common features, including two fiberglass skins attached to a frame and a foamed inner core. It is not disputed that all of the skins of Plastpro's grained fiberglass doors have filaments in the top 0.005 inch of the skins. (Def.'s Rule 56.1 Statement ¶ 2; Pl.'s Rule 56.1 Statement ¶ 1.).

### *Standard of Review*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *Fed. R.Civ.P.* 56. Rule 56(e) requires that when a motion for summary judgment is made, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.*; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No issue for trial exists unless unless the non-moving party can demonstrate sufficient evidence favoring it such that a reasonable jury could return a verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

Summary judgment may be granted if the materials submitted to the Court show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56; *Hersh v. Allen Prod. Co.,* 789 F.2d 230, 232 (3d Cir.1986). Where the facts are not in dispute and the issues contested in a summary judgment motion

are legal issues, the court may proceed to decide the legal issues and rule accordingly on the summary judgment motion. *See Ingram v. County of Bucks,* 144 F.3d 265, 267 (3d Cir.1998) (when there is no genuine issue of material fact in dispute and the issue facing the court is a question of law, it is properly resolved on summary judgment). Such is the case here.

### Discussion

All of the claims of the '540 patent contain the contested claim limitation in this case. Claim 1 of the '540 patent requires:

A door assembly comprising, in combination, a rectangular frame, a pair of opposed compression molded skins mounted on said frame, and a foamed core positioned within said frame between and adhered to said opposed compression molded skins, said skins each having an outer side and an inner side, a vertically extending projection positioned on each vertical edge of said inner side of said compression molded skins, said projections engaging said rectangular frame, said compression molded skins being integral, including a molding resin and glass fibers, said outside of said skin being *essentially devoid of glass fibers for a predetermined depth of at least 0.005 inch,* said outer side of said skin defining a textured pattern simulating the grain and texture of a wood door, said textured pattern having a pattern depth between 0.003 inch and 0.009 inch, but not in excess of such predetermined depth.

(McQuillen Dec., Exh. A, col. 4, ll. 4–20) (emphasis added).

Plastpro seeks a summary declaratory judgment that:

(1) None of the grained fiberglass doors manufactured by Nan Ya and sold by Plastpro, including the remaining accused doors, literally infringe any claim of the '540 patent;

(2) None of the grained fiberglass doors manufactured by Nan Ya and sold by Plastpro, including the remaining accused doors, infringe any claim of the '540 patent under the doctrine of equivalents;

(3) The term "glass fibers" as used in claims of the '540 patent shall be construed to mean "glass threads or filaments or pieces thereof;"

(4) The term "essentially devoid" as used in claims of the '540 patent shall be construed to mean that no more than "trace or residue amounts" of glass fibers may be present in the top 0.005 inch region of the skins;

(5) The term "predetermined depth" as used in the '540 patent shall be construed to mean that the depth of the fiber-free layer be "settled or decided beforehand or in advance" of forming the textured pattern in the door skins.

(Pl.'s Notice of Mot. for Summ. J.)

The parties' respective positions on claim construction are straightforward. Plastpro contends that 1) "glass fibers" must be construed as "glass threads or filaments or pieces thereof;" 2) "essentially devoid" must be construed as "no more than trace or residue amounts;" and 3) "predetermined depth" must be construed as "settled or decided beforehand or in advance." (Pl.'s Br., at 2.). Construing the claim in this manner, the presence of an average of 28 to 29 filaments (or "fibers," in Plastpro's view) in the top 0.005 inch of Plastpro's door skin (as compared to the average of 80–150 glass "fibers" for all 0.005 inch layers) renders Plastpro's doors *not* essentially devoid of glass fibers and therefore not within the claim limitation. (*Id.,* at 22.).

Therma–Tru counters that in order to serve their reinforcing and wicking functions, and to be consistent with the prosecution history, 1) "glass fibers" must be construed as "bundles of filaments;" and 2) "essentially devoid" must be construed as "virtually devoid." (Def.'s Br., at 16–17, 21–22.). So construed, the accused doors lack "bundles of fibers" to the prescribed 0.005 inch depth, thus squarely infringing on the '540 patent.

## I. *Applicable Law*

### A. *Literal Infringement*

■■ Literal infringement is determined in a two-step process. First, a court must determine a claim's acquired meaning and scope. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Second, the claim as construed must be compared to the accused product to ascertain whether it "reads" on the accused product. *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir.1995). "To establish literal infringement, every limitation set forth in a claim must be found in an accused product exactly." *Id.* Where there is no dispute as to any relevant facts regarding the accused product, literal infringement is solely a matter of claim construction. *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed.Cir.1996).

#### 1. *Claim Construction*

■ It is a court's "power and obligation to construe as a matter of law the meaning of language used in patent claims." *Markman*, 52 F.3d at 979. In discharging this obligation, a court first consults intrinsic evidence, i.e., the claim language, the written description, and the prosecution history. *Vitronics Corp. v.* *Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996).

■ The wording of a patent claim is paramount. *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed.Cir. 1998). The written description in a patent directs whether the patentee ascribed a particular meaning to disputed claim terms. *Id.* "A patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics*, 90 F.3d at 1582. Absent a special meaning, however, claim language takes on the ordinary meaning to one skilled in the art. *Digital Biometrics*, 149 F.3d at 1344.

■■ "Claims must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed.Cir. 2001). On the other hand, it is improper to read certain limitations from the patent specification into the claims. *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed.Cir.1998). Examples disclosed in the patent specification may aid in the proper interpretation of a claim, but the scope of a claim is not necessarily limited by such examples. *See Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 805 F.2d 1558, 1563 (Fed. Cir.1986) ("This court has cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification."); *see also North-*

*ern Telecom Ltd. v. Samsung Elec. Co.*, 215 F.3d 1281 (Fed.Cir.2000). Prosecution history may also shed light on the meaning of a claim, particularly in light of exchanges between the patent applicant and the Patent and Trademark Office. *Id.*

■ The Federal Circuit instructs that ordinarily "an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Vitronics*, 90 F.3d at 1583. When this is the case, it is improper for the court to rely on extrinsic evidence. *Id.* Where there is still doubt as to a claim's meaning, a court may resort to extrinsic evidence such as treatises, technical references, and expert testimony. *Id.*

■ Although treatises and dictionaries are extrinsic evidence, the Federal Circuit instructs that the district court may consult them "at any time" to aid in the construction of disputed claim terms:

> Although technical treatises and dictionaries fall within the category of extrinsic evidence, as they do not form a part of an integrated patent document, they are worthy of special note. Judges are free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.

*Id.* at 1584 n. 6.[5]

"[D]ictionaries, encyclopedias, and treatises are particularly useful resources to assist the court in determining the ordinary and customary meanings of claim terms." *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed.Cir. 2002); *see also Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed.Cir.2000) ("A dictionary is not prohibited extrinsic evidence, and is an available resource of claim construction."). It is the court's duty to consult the intrinsic record "to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor." *Texas Digital*, 308 F.3d at 1203.

a. *GLASS FIBERS: Intrinsic Evidence*

■ The competing asserted meanings for "glass fibers" are "glass threads or filaments or pieces thereof" (Plastpro) and "bundles of filaments" (Therma–Tru). Because it is "the most significant source of the legally operative meaning of disputed claim language," *Vitronics*, 90 F.3d at 1582, the Court turns first to the intrinsic evidence of record. All the independent claims of the '540 patent require that the outside of the door skins be "essentially devoid of glass fibers for a predetermined depth of at least 0.005 inch." The specification uses the terms "fibrous glass reinforcement" and "glass fibers." (McQuillen Dec., Exh. A, col. 2, ll. 43, 68.). "Fibrous glass reinforcement" describes one of the components of the sheet molding compound, or resin, compressed to form the door skins. (*Id.*, ll. 41–44.). In another

5. As of the time of this Memorandum and Order, the Federal Circuit *en banc* is reconsidering the law of claim construction, particularly the respective roles of the dictionary and the specification as sources for claim interpretation. *Phillips v. AWH Corp.*, 363 F.3d 1207 (Fed.Cir.2004), *reh'g granted*, Nos. 03–1269, 03–1286, 376 F.3d 1382 (July 21, 2004). The Federal Circuit requested briefing on a range of questions highly relevant to the claim construction inquiry, including "what use should be made of dictionaries if the primary source for claim construction should be the specification."

Pending the *en banc* decision in *Phillips*, however, the Court is of course guided by the Federal Circuit's existing pronouncements on claim construction.

portion of the specification, the disputed term is used in the following manner:

> The *elimination* of glass fibers from the surface of the exterior side provides the present structure with several advantages. First, it allows the fine grain texture to be placed in the surface to a defined depth without exposing glass fibers. The [sic] prevent wicking and other inherent fibrous glass problems from occurring. At the same time, it allows the fibrous glass reinforcement to be distributed closer to the centroid of the skin. This results in a door structure which reduces deflection.

(*Id.*, col. 3, ll. 16–24.)(emphasis added).

The specification does not expressly or impliedly define "glass fibers." Furthermore, there is no indication in the specification that the patentee ascribed a special meaning to the term. Nor does the prosecution history reveal any special meaning of the term. In fact, the fiber-free claim limitation does not appear in the '400 application in any form. The rejected '549 CIP application included the fiber-free claim limitation, but with no special meaning attached to the term. As recently as 2002, the Patent Office challenged the fiber-free limitation for obviousness. Therma–Tru's response echoed the language of the fiber-free claim limitation and does not assist the Court in its construction of the term. The Court therefore cannot agree with Therma–Tru that the plain language of the specification alone resolves the claim construction question.

As the intrinsic evidence of record—the claim language, the specification, and the prosecution history—does not indicate that Therma–Tru ascribed a particular meaning to the claim term, "glass fibers" must take on the ordinary meaning to one skilled in the art. *Digital Biometrics,* 149 F.3d at

1344. For this inquiry, the Court consults dictionaries, encyclopedias, and treatises.

b. *GLASS FIBERS: Ordinary Meaning in the Relevant Art*

In support of its construction of "glass fibers" as "glass threads or filaments or pieces thereof," Plastpro directs the Court to both general and technical dictionaries, as well as trade encyclopedias and engineering manuals available at the time the '540 patent issued. A general dictionary defines "fiber" as "a filament; any thread-like part of a substance." *See* Exh. N, WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 680. "Filament" is in turn defined as "a thread; a fiber." *See id.* at 684. A scientific/technical dictionary defines "glass fiber" as "[a] glass thread less than a thousandth of an inch thick, used loosely or in woven form as a . . . reinforcing material in laminated plastics." *See* Exh. O, McGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS 685. Finally, one scientific dictionary essentially defines "fiber" and "filament" as synonyms of one another. *See* Exh. P, THE CONDENSED CHEMICAL DICTIONARY 388 (defining "filament" as "a continuous fiber"). An engineering manual on materials states that standard glass fiber is spun as "single glass filaments . . . collected into strands that are manufactured into many forms of reinforcement." *See* Exh. Q, MATERIALS HANDBOOK 385.

In support of its construction of "glass fibers" to include "pieces of filaments," Plastpro cites to a handbook on reinforced plastics in which it is noted that "chopped fiber lengths" are used as reinforcement in sheet molding compounds such as are at issue in this case. *See* Exh. T, HANDBOOK OF TECHNOLOGY AND ENGINEERING OF REINFORCED PLASTICS/COMPOSITES 216.[6]

---

**6.** Plastpro also refers the Court to *Therma-* *Tru Corp. v. Pease Indus., Inc.,* No. 97–70164

The above objective sources clearly support construction of "glass fibers" as threads, filaments, or pieces of filaments. However, as discussed below, ThermaTru urges that the plain meaning of the term is "bundles of filaments" or, if not, then the Court should look beyond the demonstrated plain meaning of the term to find a definition more suited to the practical functioning of glass fibers in the invention.

In support of its "ordinary meaning" position, Therma–Tru argues that, because the '540 patent specification implicitly defines "glass fibers" as "bundles of filaments," Plastpro erroneously relies on extrinsic evidence to support its construction.[7] Therma–Tru contends that an implicit definition is discernible from the '540 patent's repeated use of the term "glass fibers." It also argues that the prosecution history reinforces its proposed construction. Therefore, it is Therma–Tru's position that the Court need go no further than the intrinsic evidence in the record to construe the fiber-free claim limitation.

The Court finds Therma–Tru's positions unpersuasive. The patentee's "multiple and consistent use" of the term "glass fibers" in no way conveys an implicit definition of the term. The term is used repeatedly in the specification and claims without any definition or further clarification. The mere repetition of "glass fibers" does nothing to convey its meaning. The phrase "bundles of filaments" does not appear in any form in the '540 patent or its prosecution history. In order for "glass fibers" to take on a "bundles" definition, such a special meaning would have to be "clearly stated in the patent specification or file history." *Vitronics,* 90 F.3d at 1582. That is not the case here.

Therma–Tru further argues that general and technical dictionaries do not consistently define a "fiber" as a "filament." Therma–Tru is correct that differing dictionary definitions must be reconciled with reference to the patent itself, but it does not offer a contemporaneous objective source to support its construction. Rather, Therma–Tru relies on the testimony of several experts.

For example, Kenneth West, a Therma–Tru employee involved in the production of fiberglass doors, concluded in his Technical Expert Report that "if individual filaments are used in the SMC manufacturing process, the resulting door skins would be unacceptable in appearance and strength." (Dec. of Sangeeta Shah, Exh. D, at 16.). Mr. West further noted:

> The functional characteristics of the '540 'glass fibers' clarify the patentee's intent in defining 'glass fibers' to constitute a bundle of filaments and not a single filament. The use of fine grain texturing at the surface to a defined depth does prevent surface exposure of *bundles* of filaments, i.e., glass fibers. However, surface texturing cannot eliminate single break away filaments from being exposed at the surface. Moreover, the

(July 14, 1998), an Eastern District of Michigan decision construing the '540 patent's fiber-free limitation as "glass threads or filaments or pieces thereof." Although the claim construction in *Pease* does not bind this Court, the Court has considered the underlying reasoning for the Michigan district court's construction of the same claim limitation disputed in this case. In *Pease* the court adopted the recommendations of a Special Master who reviewed the intrinsic and extrinsic evidence in the case. The court found that the Master's recommended construction comported with the form in which such fibers are used in the industry. *See* Exh. W at 3; Exh. X at 20.

7. However, Therma–Tru itself offers extrinsic evidence almost exclusively to support its construction of "glass fibers." *See* Def.'s Opp. Br., at 13–17.

existence of these single glass *filaments* at the exterior surface does not affect any of the functional reasons identified in the '540 patent for *suppression of glass fibers,* i.e., to avoid wicking, provide reinforcement, a high quality surface appearance, and ease in handling. (*Id.* at 17.)(emphasis in original).

Robert R. Jackson, Director of Research and Development at Therma–Tru, testified that a fiber is a "bundle of filaments." (*Id.,* Exh. F, at 28.). John M. Maxel, an expert for Therma–Tru in this litigation, also testified that a "fiber" is a "bundle of filaments," and acknowledged that while a bundle consists of approximately 200 filaments, as few as 100 filaments would also constitute a bundle. (*Id.,* Exh. G, at 18 ll. 20–23; at 21–22.). Therma–Tru also offers the testimony of John E. Thorn, the inventor, who testified that the intent of the patent was to suppress the majority of the fibers (which he referred to as "clusters of filaments") from the top .005 inch of the door skin. (*Id.,* Exh. H, at 27, ll. 7–16.)

▮ As a threshold issue of the correct legal standard to apply to Therma–Tru's evidence, the Court notes that the Federal Circuit clearly favors "objective resources" such as dictionaries, encyclopedias, and treatises over expert testimony on claim construction:

> Dictionaries, encyclopedias, and treatises, publicly available at the time the patent is issued, are objective resources that serve as reliable sources of information on the established meanings that would have been attributed to the terms of the claims by those of skill in the art. Such references are unbiased reflections of common understanding not influenced by expert testimony or events subsequent to the fixing of the intrinsic record by the grant of the patent, not colored by the motives of the parties, and not inspired by litigation.

*Texas Digital Sys.,* 308 F.3d at 1202–03.

These objective sources are preferred over the expert testimony of attorneys, technical experts, and even the inventors themselves. *Vitronics,* 90 F.3d at 1585. Given that "opinion testimony on claim construction should be treated with the utmost caution, for it is no better than opinion testimony on the meaning of statutory terms," *id.,* the Court places emphasis on contemporaneous objective resources over opinion testimony to discern the ordinary meaning to one skilled in the art.

As to its "practical functioning" position, Therma–Tru does not convincingly show that the ordinary meaning of glass fibers is inconsistent with the practical function of glass fibers in the invention. The Court addresses each of ThermaTru's "functional" arguments that Plastpro's proposed construction contradicts the "implicit definition" of the term.

*1. Individual Filaments Are Not Available to Purchase*

Therma–Tru contends that "glass fibers" must mean "bundles of filaments" because one cannot purchase single glass threads. However, this is irrelevant to the Court's inquiry into the proper meaning of "glass fibers" as used in the invention. Indeed, the form in which a raw material is marketed and sold may have little resemblance to the form it assumes once incorporated in a patented product or process. Furthermore, there is evidence in the record that bundles or rovings of glass fibers may "filamentize," or break down into individual threads, during the compression molding process, which further suggests that the relevant inquiry is not the form the fiberglass takes at the time of purchase, but the form it assumes when used in the molding process. *See* McQuillen Dec., Exh. M ¶ 41 (distinguishing "hard" glass from "soft" glass and noting

that, when combined with the SMC resin, the latter "tend[s] to separate into individual filaments."); *see also id.*, Exh. Q, MATERIALS HANDBOOK 385 (noting that "fibers spun as single glass filaments ... are collected into strands that are manufactured into many forms of reinforcement," thus implying that the manufactured form may vary widely from the ultimate reinforcing form.).

### 2. Individual Filaments Do Not Perform the Required Reinforcement

Therma–Tru next contends that individual filaments cannot adequately reinforce the door skins. Its essential argument is that single filaments "would cause the SMC compound to fall apart during molding." (Def.'s Opp. Br., at 16.). However, construing "glass fibers" to mean filaments does not contravene the reinforcing function attributed to "glass fibers" in the specification. The description of the glass fibers' function in the specification is as follows: "The elimination of glass fibers from the surface of the exterior side ... allows the fibrous glass reinforcement to be distributed closer to the centroid of the skin. This results in a door structure which reduces deflection." (McQuillen Dec., Exh. A, col. 3, ll. 16–24.). The McGraw–Hill Dictionary of Scientific and Technical Terms, a source available at the time the '540 patent issued, notes that a glass fiber may be "used loosely or in woven form ... as a reinforcing material." (*Id.*, Exh. O, at 685.). Therefore, to one skilled in the art, the ordinary meaning of "glass fiber" in the reinforcement context must include individual filaments.

### 3. Individual Filaments Do Not Solve the "Wicking" Problem

Therma–Tru argues that the wicking problem only arises if *bundles* of filaments occur at the surface of the skins; because single filaments are incapable of wicking stain, the '540 patent thus implicitly defines fibers to mean bundles. In support, Therma–Tru points only to the patent itself and a general definition of wicking in support of its position. However, the statements of Therma–Tru's experts make clear that the precise quantity of filaments required to make a wicking-resistant bundle is not clear.

On the one hand, Therma–Tru's Kenneth West testified that "[a] bundle of filaments includes approximately 200 glass filaments." (Shah Dec., Exh. D at 16.). Burr L. Leach, a Therma–Tru expert in prior litigation, stated that a fiber consists of approximately 264 filaments. (*Id.*, Exh. E, at 95, ll. 11–15.). John M. Maxel, Therma–Tru's expert in this litigation, testified that a fiber consists of approximately 200 filaments, but that even 100 filaments could also constitute a fiber. (*Id.*, Exh. G, at 21–22.). Maxel emphasized that defining a fiber in terms of filaments is "not black and white." (*Id.* at 22.).

Significantly, West testified that as few as three filaments could cause a wicking problem. (McQuillen Reply Dec., Exh. D, at 59, ll. 23–25.). If as few as three filaments can cause wicking (and none of the cited experts suggests that three filaments would constitute a "bundle"), it cannot be that "the wicking problem only arises if bundles of filaments occur at the surface of the skins." Therefore, it would be consistent with the specification to construe "glass fibers" as "threads" or "filaments" or "pieces thereof" because, if not suppressed to a certain depth below the surface, even a few filaments can cause a wicking problem.

Because the ordinary meaning of the term to one skilled in the art is not inconsistent with the intrinsic evidence, *Vitronics*, 90 F.3d at 1584 n. 6, the Court finds that "glass fibers" should be interpreted as

"glass threads or filaments or pieces thereof."

## c. *ESSENTIALLY DEVOID:*
### *Intrinsic Evidence*

▮ Plastpro next argues that "essentially devoid" should be construed as "lacking or having an absence of, except for trace or residue amounts." ThermaTru contends that the term is more appropriately defined as "virtually or in essence devoid," but offers no intrinsic or extrinsic evidence to support its construction. Therma–Tru reasons that while the phrase does not connote the absolute exclusion of glass fibers from the surface of the skin, the proper construction of the term must functionally prevent a surface that wicks stain. Plastpro objects to ThermaTru's proposed meaning because its inherent ambiguity does not provide a meaningful standard against which infringement can be judged.

The intrinsic evidence does not contain an explicit definition of "essentially devoid." However, the '540 specification and the prosecution history do offer some helpful assistance. The '540 patent's enumeration of the supposed advantages of a fiber-free surface is prefaced by: "The *elimination* of glass fibers from the surface of the exterior side provides the present structure with several advantages." (McQuillen Dec., Exh. A, col. 3, ll.16–18.)(emphasis added). Similarly, an amendment to the '549 CIP application contained the following Remark: "The combination of opposed SMC panels ... where the exterior surface is *devoid* of glass fibers ... results in a door assembly which is far superior to prior art doors." (*Id.*, Exh. D, at 47) (emphasis added). In other words, the unqualified use of the terms "elimination" and "devoid" indicates a complete lack of fibers. A fair and plain reading of these descriptions suggests to a person skilled in the art that *no* glass

fibers should be present in the outer 0.005 inch of the door skins.

Logically, then, "essentially devoid" must mean as near as possible to a complete absence, or at most trace amounts of glass fibers. Plastpro's cited dictionary references support such a meaning. *See* McQuillen Dec., Exh. AA, THE RANDOM HOUSE COLLEGE DICTIONARY 451 (listing "essentially" as synonymous with "fundamentally," "inherently," or "intrinsically"). Unlike Therma–Tru's "virtually or in essence devoid," Plastpro's construction is not only consistent with the specification and prosecution history, but lends itself to quantification and therefore provides a standard for infringement. If the meaning of "essentially devoid" is ambiguous, "virtually devoid" does little to clarify it. The phrase "essentially devoid" is interpreted as meaning "lacking or having an absence of except for trace or residue amounts."

Restated in light of these constructions, the fiber-free claim limitation becomes: "outside of said skin lacking or having an absence of glass threads or filaments or pieces thereof except for trace or residue amounts for a predetermined depth of at least 0.005 inch." The Court need not construe the phrase "predetermined depth" because it is not necessary to resolve this infringement action.

## II. *Application of the Fiber–Free Limitation to Plastpro's Accused Doors*

### A. *Literal Infringement*

Charles L. Tucker III, Ph.D., a professor of mechanical engineering, tested two doors "representative of all simulated wood-grain doors manufactured by Nan Ya Plastics and sold by Plastpro ... with respect to the spatial distribution of the glass fibers in the skin." (McQuillen Dec., Exh. M, at ¶ 122.). Dr. Tucker removed from each of the samples a circular plug of

material consisting of the front fiberglass skin, the foam core, and the back fiberglass skin. (*Id.*, Exh. M, at A2.). A rectangular strip was cut radially from each disk to obtain smaller specimens for a scanning electron microscope (SEM). (*Id.*). Multiple SEM images at various degrees of magnification were taken. (*Id.* at A4.). Tucker's report reveals high magnification images showing the glass fibers distributed throughout the skin. (*Id.*, at A9, Fig. 6.). The number of fibers in each layer was determined by hand counting. (*Id.* at A10.).

Dr. Tucker then compared the average glass fiber count in the top 0.005 inch layer with the average for all 0.005 inch layers throughout the skin. (*Id.* ¶ 124.). The Court reproduces Dr. Tucker's table of results here:

**Average Glass Fiber Count**

|  | Interlock Door | Flat–Edge Door |
|---|---|---|
| Avg. for top 0.005 inch layer | 28.8 | 27.8 |
| Avg. for all 0.005 inch layer | 151.5 | 81.5 |

(*Id.*).

For example, the Interlock Door tested for 28.8 fibers in the outer 0.005 inch layer of the skin, while the average number of fibers for all 0.005 inch layers of the skin was 151.5.

Plastpro argues that the claim limitation "essentially devoid of glass fibers for a predetermined depth of 0.005 inch" is not satisfied given that in both doors tested the average count of glass fibers in the top 0.005 inch was 19% or 34.4% of the average total amount counted in all 0.005 inch layers. The Court agrees that the top 0.005 inch of Plastpro's doors

contains more than trace or residue amounts of glass threads or filaments or pieces thereof. Perhaps because Dr. Tucker's analysis is premised on a claim construction involving the term "glass fibers" which it rejects, Therma–Tru does not dispute the results of Dr. Tucker's analysis, nor does it dispute the infringement analysis that results from Plastpro's proposed construction of the claim.

Based on the foregoing analysis, Plastpro's doors do not literally infringe the '540 patent.

### B. Doctrine of Equivalents

Plastpro also seeks to have this Court declare that its doors do not infringe the '540 patent under the doctrine of equivalents. Plastpro disputes the applicability of the doctrine of equivalents to the fiber-free claim limitation. However, assuming the doctrine of equivalents is applicable, Plastpro argues that there is no equivalent structure in its doors reducing deflection in substantially the same way as required by the fiber-free claim limitation. (Pl.'s Br. at 31.). To some extent, this is the only logical result given the construction of "glass fibers" as meaning "threads, filaments, or pieces thereof." Under this construction, the distinction is clear between doors reinforced by concentrated bundles at the center of the skin and doors reinforced by dispersal of fibers generally throughout the skin. Therefore, in this case claim construction has essentially resolved the infringement issues both literally and under the doctrine of equivalents. ThermaTru does not substantively address Plastpro's doctrine of equivalents argument.[8]

---

8. Therma–Tru makes only cursory mention of "an equivalent structure" at the conclusion of its opposition brief: "Once the 'glass fiber' limitation is properly construed, it necessarily

follows that the accused doors meet the 'essentially devoid' limitation literally. Moreover, because the 'essentially devoid' limitation was never amended, the accused doors

■■■ An accused product that does not literally infringe may nonetheless still infringe under the "doctrine of equivalents," which allows a patentee to claim insubstantial alterations not expressly captured in the drafting of the original patent claim. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). An element of an accused product is the equivalent of a claim limitation if the element performs substantially the same function as the claim limitation to which it is being compared, in substantially the same way to obtain the same result. *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) (the "function-way-result" test). When considering an equivalence argument, the court makes the essential inquiry: "Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). "The doctrine [of equivalents], which requires an element-by-element inquiry, cannot be used to eliminate completely any claim element." HERBERT F. SCHWARTZ, PATENT LAW & PRACTICE 142 (3d ed.2001) (citing *Warner–Jenkinson*, 520 U.S. at 40, 117 S.Ct. 1040.).

■■■ The '540 patent specification provides that one of the aims of suppressing the fibers below the 0.005 inch layer (and therefore concentrating the fibers toward the center of the skin) is the reduction of deflection. (McQuillen Dec., Exh. A, col. 3, ll. 21–24.). As the Court discussed at length above, Plastpro's doors contain relatively significant quantities of glass fibers in the top 0.005 inch of the skins. Fur-

thermore, the evidence in the record demonstrates that this feature of Plastpro's doors is the deliberate result of its use of so-called "soft glass," a type of glass specifically designed to separate into individual fibers during the compression molding process. (McQuillen Dec., Exh. M, ¶ 40 (noting that if the "binder" holding the fibers together in bundles is soluble in the SMC resin, the bundles are termed "soft glass" and "tend to separate into individual filaments when the SMC is handled and molded.")).

As compared to "hard glass" (which tends to maintain its bundled form throughout the molding process) (*id.*), Dr. Tucker indicated in his report that the properties of "soft glass" result in clear structural and reinforcing differences. The dispersal of glass fibers *throughout the door skin*, as opposed to concentrating the fibers in the center of the skin (per Therma–Tru's doors), produces a stronger door. (*Id.*, ¶ 132.). Thus, while both parties' compression molded doors are designed to achieve high strength and stability, Plastpro's method for doing so is substantially different from Therma–Tru's. Therefore, Plastpro's doors do not infringe the fiber-free claim limitation of the '540 patent under the doctrine of equivalents.

### Conclusion

To the extent that all of Plastpro's grained door assemblies have the same spatial distribution of glass fibers in the door skins (*Id.*, Exh. M, ¶ 122; Pl.'s Br. at 7.), these doors do not infringe the '540 patent either literally or under the doctrine of equivalents. The Court agrees with Plastpro's proposed construction of the terms "glass fibers" and "essentially

would at a minimum constitute an equivalent structure." (Def.'s Br. at 23.). Therefore, as the Court reads it, Therma–Tru's brief argues

only for literal infringement based on its construction of "glass fibers" as "bundles of filaments."

devoid." The Court does not construe "predetermined depth" because it is not necessary to resolve the infringement issues presented.

Accordingly, **IT IS** on this 13th day of June 2005 **ORDERED** that Plastpro, Inc.'s motion for summary judgment is granted and the following declaratory judgment is entered:

1. The term "glass fibers" as used in the claims of U.S. Patent No. 4,550,540 is construed to mean "glass threads or filaments or pieces thereof;"

2. The term "essentially devoid" as used in the claims of U.S. Patent No. 4,550,540 is construed to mean that "no more than trace or residue amounts" of glass fibers may be present in the top 0.005 inch of the door skins;

3. None of Plastpro's grained fiberglass doors infringe any claim of U.S. Patent No. 4,550,540 either literally or under the doctrine of equivalents.

Therma–Tru's counterclaim against Plastpro for patent infringement is dismissed based on the foregoing analysis. The parties are directed to inform the Court as to what parties and claims remain after this judgment.